### UNITED STATES DISTRICT COURT
### DISTRICT OF SOUTH CAROLINA
### COLUMBIA DIVISION

| | |
|---|---|
| SOUTH CAROLINA PROGRESSIVE NETWORK EDUCATION FUND, | Case No.  3:20-cv-03503-MGL |
| Plaintiff, | **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| v. | |
| MARCI ANDINO, in her official capacity as Executive Director of the South Carolina State Election Commission; JOHN WELLS, in his official capacity as Chair of the South Carolina State Election Commission; and JOANNE DAY, CLIFFORD J. EDLER, LINDA MCCALL and SCOTT MOSLEY, in their official capacities as members of the South Carolina State Election Commission, | |
| Defendants. | |

Plaintiff South Carolina Progressive Network Education Fund, by and through the undersigned attorneys, files this Complaint for Injunctive and Declaratory Relief against Defendants Marci Andino, in her official capacity as Executive Director of the South Carolina State Election Commission (the "Commission"), John Wells, in his official capacity as Chair of the Commission, and JoAnne Day, Clifford J. Edler, Linda McCall, and Scott Mosley, in their official capacities as members of the Commission.  This Complaint is based on the facts and allegations below.  Plaintiff alleges as follows:

## INTRODUCTION

1.      As the COVID-19 pandemic rages on, infecting over a million people and taking over 207,000 lives in the United States, South Carolina election laws, as applied in the context of the pandemic, operate to deprive Plaintiff South Carolina Progressive Network Education Fund ("the Network") of its political speech and association rights secured by the First and Fourteenth Amendments to register people to vote.

2.      South Carolina requires that all voters register to vote no later than 30 days before the election.  S.C. Code Ann. § 7-5-150.

3.      That means that any South Carolinian who wishes to vote in this year's election on November 3, 2020 must register by Sunday, October 4, 2020.  Because many county, in-person facilities are closed on weekends, some voters have to register in-person by Friday, October 2, 2020.  The cut off for internet-based registrations is October 4 and mailed registrations must be postmarked by October 5.[1]  These deadlines (the "Voter Registration Cutoffs") are arbitrary limits, even in normal election years.

4.      But this is no ordinary year.  This year, South Carolina, like the rest of the country and world, is grappling with the devastating and enduring effects of the COVID-19 pandemic which, in conjunction with these arbitrary Voter Registration Cutoffs, has made it much more difficult to register voters for the November 2020 elections.

5.      Plaintiff the Network is a non-partisan and not-for-profit organization working to register voters ahead of the November election.

---

[1] *See* South Carolina Election Commission, *Five Days Remain to Get Registered for General Election,* (Sept. 29, 2020), *available at* https://www.scvotes.gov/index.php/five-days-remain-get-registered-general-election.

6.      From April 6, 2020, when South Carolina imposed a stay-at-home order and other restrictions on day-to-day interactions in order to mitigate the effects of the pandemic, Plaintiff the Network was effectively prevented from registering voters in the normal course of its activities and was forced into a much less effective "pandemic model" of registration.

7.      The Network tried to register as many voters as possible ahead of the Voter Registration Cutoffs notwithstanding the pandemic conditions, and adapted to these new circumstances, but the Voter Registration Cutoffs are bearing down on its activities.  Unless the Voter Registration Cutoffs are extended, the Network will not be able to register eligible voters that they would have been able to reach in a normal year.  As a result, many South Carolinians will be disenfranchised.

8.      The act of registering people to vote through voter registration drives is the exercise of core political speech and association rights secured by the First and Fourteenth Amendments.

9.      Defendants' enforcement of the Voter Registration Cutoffs, as applied under the pandemic conditions, severely burdens Plaintiff's right to register voters for the election, and is a violation of Plaintiff's constitutional rights enshrined in the First and Fourteenth Amendments.

10.      Extending the registration dates would not burden Defendants, as they have extended these deadlines under S.C. Code Ann. § 7-5-150 repeatedly in the past in response to natural disasters.  Defendant Andino has admitted that the South Carolina State Election Commission ("SEC") does not require the 30 days provided for in S.C. Code Ann. § 7-5-150 to finalize voter rolls.  The SEC has also supported legislation shortening the Voter Registration Cutoffs.

11.     The Network bring this case seeking an immediate temporary restraining order and a preliminary injunction declaring the Voter Registration Cutoffs unconstitutional as applied, enjoining Defendants from enforcing the Voter Registration Cutoffs this year, and directing Defendants to extend them to a date no sooner than October 19 so that many more eligible voters can be registered to vote before the November election.

## PARTIES

12.     Plaintiff South Carolina Progressive Network Education Fund is a non-partisan non-profit civic engagement organization whose mission is to promote — through education and action — human, civil, and workers' rights, reproductive freedom, environmental protection, and government reform.  As part of that mission, the Network encourages voter registration and electoral participation in South Carolina.  The Network has had to divert money, personnel, time, and resources away from its planned activities due to the conduct alleged here.  Specifically, the Network has had to divert and spend additional money, time, and other resources it would not otherwise have spent to register voters ahead of the Voter Registration Cutoffs because Defendants have not extended the Voter Registration Cutoffs, despite the extreme and unprecedented impact of a global pandemic and state emergency.  Defendant's enforcement of the Voter Registration Cutoffs under these conditions has frustrated the Network's fundamental mission of registering as many voters as possible in 2020.  Defendant's enforcement of the Voter Registration Cutoffs under these conditions severely burdens Plaintiff's ability to engage in constitutionally protected political speech and association rights through its voter registration efforts.

13.     Defendant Andino is sued in her official capacity as Executive Director of the South Carolina State Election Commission.  The Executive Director is the Chief Administrative Officer for the State Election Commission and is required by law to supervise the County Boards

of Elections and Voter Registration.  S.C. Code Ann. § 7-3-20.  In this role, she is tasked with ensuring that those County Boards comply with state and federal law in the conduct of elections and voter registration.  *Id.* at § 7-3-20(C).

14.    Defendant John Wells is the Chair of the South Carolina Election Commission and is sued in his official capacity.  Defendants JoAnne Day, Clifford J. Edler, Linda McCall, and Scott Mosley are members of the South Carolina Election Commission and are sued in their official capacities.  The Executive Director serves at the pleasure of the South Carolina Election Commission.  S.C. Code Ann. § 7- 3-20(A).  The South Carolina Election Commission is responsible for carrying out all laws related to registration and voting, and to promulgate relevant regulations.  *Id.* § 7-15-10.  The stated mission of the Commission is, in relevant part, to ensure that every eligible citizen has the opportunity to participate in fair and impartial elections with the assurance that every vote will count.

## JURISDICTION AND VENUE

15.    Plaintiff brings this action pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of their rights under the First and Fourteenth Amendments to the U.S. Constitution.

16.    This Court has jurisdiction under Article III, § 2 of the United States Constitution, and pursuant to 28 U.S.C. §§ 1331, 1343, and 1357.

17.    This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

18.    Venue in this district is proper under 28 U.S.C. § 1391 because the Defendants resides in this District and a substantial part of the events or omissions giving rise to this claim occurred in this District.

## STATEMENT OF FACTS AND LAW

### I. SOUTH CAROLINA'S ELECTION LAWS IMPOSE AN ARBITRARY LIMIT ON VOTER REGISTRATION

19.     South Carolina law requires voters to register to vote 30 days before an election to be able to vote in that election.  S.C. Code Ann. § 7-5-150.

20.     For the November 3, 2020 general election, the registration deadline is thus Sunday, October 4, which is also the last day voters can register on the internet, S.C. Code Ann. § 7-5-185(A).

21.     Since in-person registration offices are largely not open on the weekend, the effective deadline for in-person voter registration in many locations is Friday, October 2.  S.C. Code Ann. § 7-5-130 (voter registration offices are open "during the same hours as other county offices are normally open").

22.     Voters may mail their registration paperwork on October 5, so long as their registrations are postmarked on that day.  S.C. Code Ann. § 7-5-155(a)(1).

23.     South Carolina is one of only nine states with a 30-day registration deadline; every other state and territory has a shorter deadline.[2]

### II. COVID-19 HAS SPREAD THROUGH THE UNITED STATES AND THROUGH SOUTH CAROLINA IN PARTICULAR

24.     The coronavirus has been spreading throughout the United States since early 2020.

---

[2] *See* National Conference of State Legislatures, Voter Registration Deadlines, *available at* https://www.ncsl.org/research/elections-and-campaigns/voter-registration-deadlines.aspx#table%201.  Of these nine states, Montana allows same day registration in most cases, Mont. Code Ann. § 13-2-304(1)(a), and Louisiana allows online registrations up till twenty days before the election, La. Stat. Ann. § 18:135(A)(3).

25.     The coronavirus is known to spread from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects.[3]

26.     The risk that the coronavirus will spread to another person increases when the infected person sneezes or coughs, or when an infected person stands within 6 feet of other people for an extended period of time.[4]

27.     The coronavirus can also spread when a person touches a surface or object that has the virus on it and then touches their own mouth, nose, or eyes.[5]

28.     Once contracted, the coronavirus can have a range of effects, from passing without any symptoms at all, to flu-like symptoms, to causing a severe immune system response that can cause fluid to build in the person's lungs and lead to death.[6]

29.     Because of the highly contagious and potentially deadly nature of COVID-19, on March 13, 2020, President Trump declared a national state of emergency.[7]

---

[3] CDC Coronavirus disease 2019 (COVID-19) Factsheet, *What you should know about COVID-19 to protect yourself and others*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf.

[4] *Id.*

[5] *Id.*

[6] Ctrs. for Disease Control and Prevention, People Who Are at Higher Risk for Severe Illness, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. (last visited Apr. 30, 2020).

[7] *FEMA COVID-19 Emergency Declaration*, *available at* https://www.fema.gov/news-release/2020/03/13/covid-19-emergency-declaration.

30.    The first known case of community-based transmission of COVID-19 in South Carolina was documented on March 6, 2020.[8]  Cases then spread rapidly, with the first death occurring on March 16.[9]

31.    Charleston became the first community in the state to issue a stay-at-home order, on March 24, requiring people to stay indoors as much as possible.  City of Charleston Ordinance No. 2020-042.

32.    The virus reached all 46 of South Carolina's counties on April 2.

33.    Governor Henry McMaster declared a state of emergency in early March and issued several executive orders closing schools, bars, restaurants, and other business, prohibiting gatherings of 10 or more people, and requiring residents to engage in social distancing and "remain[] at home whenever possible."  Exec. Order 2020-21 (Apr. 6, 2020); *see also* Exec. Order 2020-07 (Mar. 11, 2020); Exec. Order 2020-08 (Mar. 13, 2020); Exec. Order 2020-09 (Mar. 15, 2020); Exec. Order 2020-15 (Mar. 28, 2020); Exec. Order 2020-16 (Mar. 30, 2020); Exec. Order 2020-23 (Apr. 12, 2020); Exec. Order 2020-29 (Apr. 27, 2020); Exec. Order 2020-35 (May 12, 2020); Exec. Order 2020-38 (May 27, 2020); Exec. Order 2020-40 (June 11, 2020); Exec. Order 2020-42 (June 26, 2020); Exec. Order 2020-44 (July 11, 2020); Exec. Order 2020-48 (July 26, 2020); Exec. Order 2020-53 (Aug. 10, 2020); Exec. Order 2020-56 (Aug. 25, 2020); Exec. Order 2020-59 (Sept. 9, 2020).

---

[8] *DHEC News Release*, *available at* https://scdhec.gov/news-releases/dhec-investigating-two-possible-cases-2019-novel-coronavirus-south-carolina.

[9] *DHEC News Release*, *available at* https://scdhec.gov/news-releases/state-south-carolina-reports-first-covid-19-related-death.

34.     On March 27, 2020, the President approved a major disaster declaration for the State of South Carolina.[10]

35.     By mid-April, there were hopes that the state might expect no more than a few hundred deaths due to the virus by August.

36.     South Carolina was praised for its response to the virus and the Governor lifted the remaining stay at home order on May 3.  Exec Order. 2020-31.

37.     On May 21, 2020, he issued an executive order authorizing certain businesses "previously deemed 'non-essential'" to re-open with conditions, including arcades, selected tourist attractions, bingo halls, public playgrounds, and sports activities that "involve interaction in close proximity to and within less than six (6) feet of another person."  Exec. Order 2020-37 (May 21, 2020).

38.     By mid-May, voter registration groups hoped that they would be able to return to full capacity over the summer.

39.     The virus returned in force, however, and the state recorded over 12,000 cases and 500 deaths by June 1.

40.     By mid-June, case numbers skyrocketed in the state and South Carolina was found to have one of the highest rates of new cases per resident in the country.

41.     By July 9, the state had more than 50,000 cases and almost 900 deaths.  By the end of that month, the state had over 85,000 cases and over 1,500 deaths.  By mid-August, South Carolina had more than 100,000 cases and 2,000 deaths.  By mid-September, the state had over 130,000 cases and over 3,000 deaths.

---

[10] *President Donald J. Trump Approves South Carolina Disaster Declaration*, *available at* https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-approves-south-carolina-disaster-declaration-5/

42.     Universities in the state closed in March and reopened in late August, but quickly saw huge spikes in infections.  Many imposed new social distancing requirements and moved classes online.[11]

43.     To date, COVID-19 has killed more than 207,000 people across the country.[12]

44.     South Carolina has been one of the hardest-hit states in the country.  As of October 1, the CDC reports that South Carolina has had over 148,000 cases and over 3,350 deaths, and lists the state as the 8th highest for cases per 100,000 residents.

45.     Just in the last week, over 122 people have died and there have been over 6,000 new cases in the state, making it the state with the 10th highest number of new cases in the country.

46.     Because South Carolina has tested only a small percentage of residents for coronavirus infection, it is likely that the true rate of infection and fatalities is higher than reported.

47.     Governor McMaster renewed the state of emergency most recently on September 24, repeatedly invoking the "extraordinary measures" the state was going to have to take to combat the virus, including continued social distancing.  Exec. Order 2020-62 (September 24, 2020).

---

[11] *Novel Coronavirus (COVID-19) Information*, Winthrop University, *available at* https://bit.ly/30qNhwq (accessed October 1, 2020); *Fall, as we know it, is canceled. So, Columbia is finding new ways to fill the season*, Benedict College, September 30, 2020, *available at* https://bit.ly/3l7AwP0; Matt Connolly, *Clemson University to start fall semester with online classes due to COVID-19 concerns*, The Slate, July 22, 2020, *available at* https://bit.ly/3cOVShx; Jared Kofsky, *College of Charleston plans changes to fall semester because of COVID-19*, Live5News, June 25, 2020, *available at* https://bit.ly/34fcJ9g;

[12] Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-10), Cases in the US*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

48.    In certain populations, the virus has proven to be particularly deadly.  Elderly Americans, like many volunteers at the Network, are particularly at risk,[13] but so are Americans of all ages, particularly those with relatively common pre-existing conditions, such as high blood pressure.

49.    The Surgeon General of the United States, Dr. Jerome Adams, recognized in April that people of color experience higher rates of infection, illness, and death, perhaps because they are less likely to be able to work from home, more likely to live in dense areas, and more likely to live in multi-generational housing.[14]  According to Dr. Anthony Fauci, the Director of the National Institute of Allergy and Infectious Diseases, "[t]he coronavirus has been a 'double whammy' for black people" because "they are more likely to be exposed to the disease by way of their employment in jobs that cannot be done remotely" and "they are more vulnerable to severe illness from the coronavirus because they have higher rates of underlying conditions like diabetes, high blood pressure, obesity and chronic lung disease."[15]

50.    Underlying inequities like environmental racism, lack of fair employment opportunities, unaffordable housing, poverty, and inadequate health care have increased the vulnerability of African American and Latino communities to coronavirus outbreaks.[16]  This is true in South Carolina, as well as throughout the United States.  As of September 30, 2020,

---

[13] Center for Disease Control and Prevention, *available at People at Increase Risk,* (Updated Sept. 11, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html.

[14] Juana Summers, *U.S. Surgeon General: People Of Color 'Socially Predisposed' To Coronavirus Exposure*, N.P.R. (Apr. 10, 2020), *available at* https://www.npr.org/sections/coronavirus-live-updates/2020/04/10/832026070/u-s-surgeon-general-people-of-color-socially-predisposed-to-coronavirus-exposure.

[15] Denise Grady, "*Fauci Warns That the Coronavirus Pandemic Is Far From Over,*" N.Y. Times (June 9, 2020), *available at* https://www.nytimes.com/2020/06/09/health/fauci-vaccines-coronavirus.html.

[16] *Id.*

African Americans accounted for 35.0% of all deaths related to COVID-19 in South Carolina, despite the fact that African Americans make up only 27% of the State's population.[17]

51.    There is no known effective treatment for COVID-19, and vaccines are at best several months away.[18]

52.    Public health officials therefore urge the public to practice "social distancing" (that is, to maintain a distance of at least 6 feet from other people and avoid going to crowded places), wash their hands often, clean and disinfect frequently-touched surfaces often, and wear masks when in public.

53.    The CDC cautions that wearing cloth face covers is not a substitute for social distancing.[19]

54.    CDC guidelines recommend that individuals take meaningful social distancing measures even if there is a "minimal" threat of community transmission of COVID-19 in the area.

55.    This guidance is necessitated by the reality that asymptomatic carriers appear to be contributing significantly to community spread, and Americans will remain at serious risk of contracting this unpredictable and deadly virus.

---

[17] DHEC, *South Carolina County-Level Data for COVID-19*, *available at* https://www.scdhec.gov/infectious-diseases/viruses/coronavirus-disease-2019-covid-19/south-carolina-county-level-data-covid-19 (last visited October 1, 2020).

[18] Patrick Ercolano, *A Coronavirus Vaccine Is In The Works—But It Won't Emerge Overnight*, Johns Hopkins University (April 16, 2020), *available at* https://hub.jhu.edu/2020/04/16/coronavirus-vaccine-timeline/.

[19] CDC Coronavirus disease 2019 (COVID-19) Factsheet, *What you should know about COVID-19 to protect yourself and others*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf.

56.    The COVID-19 pandemic has slowed new voter registration in South Carolina and, just as Plaintiff's registration numbers are likely to start increasing, the Voter Registration Cutoffs threaten to cut off this progress.

57.    This is confirmed by the SEC's own data, publicly available on its website.[20] Between February 29, 2020 (the date of the 2020 Democratic Party Presidential Preference Primary) and October 1, 2020, only 77,629 additional voters have registered.[21]  By comparison, in a similar period in the last president election (i.e., between February 26, 2016 and November 8, 2016), an additional 191,697 voters registered to vote.[22]  This stark drop-off in voter registrations illustrates the effects COVID-19 and the state's policies have had on voter registration in this election year.

---

[20] *Voter History Statistics for Recent SC Elections, available at* https://www.scvotes.gov/data/voter-history.html.

[21] There were 3,292,677 voters registered at the time of the 2020 Democratic primary on February 29, 2020.  *Voter History Statistics for Recent SC Elections,* South Carolina 2020 Presidential Preference Primary Democratic, *available at* https://www.scvotes.gov/cgi-bin/scsec/vothist?election=vhppd20&regvote=VOT.  As of October 1, 2020, there were 3,370,306 registered voters in South Carolina.  *South Carolina Voter Registration Demographics Statewide*, *available at* https://www.scvotes.gov/cgi-bin/scsec/96vr?countykey=ALL&D1=ALL.

[22] There were 2,961,824 voters registered in South Carolina at the time of the February 26, 2016 Democratic Party Presidential Preference Primary.  *Voter History Statistics for Recent SC Elections,* South Carolina 2016 Presidential Preference Primary Democratic, *available at* https://www.scvotes.gov/cgi-bin/scsec/vothist?election=vhppd16&regvote=VOT.  There were 3,153,521 voters registered at the time of the 2016 presidential elections, on November 8, 2016. *Voter History Statistics for Recent SC Elections,* South Carolina 2016 General Election, *available at* https://www.scvotes.gov/cgi-bin/scsec/vothist?election=vhgen16&regvote=VOT.

III.    **THE COVID-19 PANDEMIC CONDITIONS SEVERELY CURTAILED PLAINTIFF'S VOTER REGISTRATION WORK**

A.    **Plaintiff Has a Long History of Carrying Out Critical Grassroots Voter Education and Registration Work**

58.    The Network typically does its voter registration work in person. For instance, volunteers and paid staffers set up booths to do voter registration drives at major transportation hubs, or other crowded public spaces where they can engage face-to-face with people and explain the Network's mission, develop conversations around civic engagement, and discuss voter registration.

59.    The Network has worked very closely with Federally Qualified Health Centers ("FHQC") (centers qualified to receive Medicare reimbursement) to set up information tables and talk to potential voters about issues around health insurance and voting. They are the only voter registration program in South Carolina to have received permission to do this kind of outreach.

60.    The majority of long-time Network volunteers and paid staff have historically been older, as is true of many such organizations around the country, and from at-risk communities of color.

61.    The centerpiece of the Network's voter registration work is the Missing Voter Project ("MVP"), which is a joint effort by the Network and the South Carolina National Association for the Advancement of Colored People ("SC NAACP").

62.    The goal of the MVP is to grow an informed electorate with the power to mobilize around public policies critical to young people, working families, and communities of color in South Carolina. Voter outreach to and among communities of color—many of whom are disproportionately harmed by COVID-19—is a key part of this mission.

63.    The MVP is designed to work year-round to help develop a movement for social and political change.  The MVP registers people at places where people congregate, including health centers, food banks, homeless shelters, and bus stations.

64.    Another major focus of the MVP is festivals and public events, where in-person outreach is possible.  For many years, MVP had a table to register voters at the Festival of Black History & Culture in Columbia, the Cornbread Festival, Lower Richland's SwampFest, as well as at Historically Black Colleges and Universities ("HBCU") football games and social events. In 2018, the Network organized a "Cookout & Shout-out for Democracy" to register missing voters.

65.    With in-person registration, the Network has been able to connect with large numbers of people at the same time to provide voter education and create civic engagement, as opposed to a one-time contact to assist with filling out a form.  Such outreach is a key part of the Network's larger mission, which includes organizing around voter mobilization campaigns (i.e., get out the vote), health care issues affecting South Carolinians such as Medicaid expansion, worker rights (particularly in light of Covid-19), and racial and criminal justice issues, among others.

66.    For 2020, the Network and the SC NAACP had set up a well-developed MVP plan, with county-based registration and education strategies.

67.    Traditionally, voter registration in South Carolina ramps up in September, when the cooler temperatures and higher level of political interest allows for much more substantial voter education.

68.    While it had historically worked mainly in the Midlands counties around Columbia, the 2020 MVP was planning to place volunteers at as many of the 17 regional FHQCs and their 100+ satellite facilities as they could muster volunteers.

69.    The MVP was also planning to have volunteers at the Regional Transit Systems, which cater to an overwhelmingly Black population.

70.    New to 2020 was a "Young Voter MVP" initiative, focused on registering and educating youth of color, given their extremely low political participation rates.

71.    This Young Voter MVP program was built around recruiting youth voters in each county for a peer-to-peer engagement with the state's 250,000 Black citizens under 30 who aren't voting.

72.    Given the interest in the presidential election and the planned expansion to the statewide network of health centers and Regional Transit Authorities, combined with our special initiative with young Black voters, the Network anticipated that it would register 10,000 voters before the registration cutoffs.

**B.    The Pandemic and Government Shutdowns Upended Plaintiff's Plans**

73.    The entire 2020 MVP plan was upended by the COVID-19 pandemic.

74.    In response to the pandemic and the Governor's orders, the high-traffic areas Plaintiff relied on to carry out its mission, including bus stations, homeless shelters, health centers, and food banks, were no longer places Plaintiff could register voters because they closed at the end of March 2020,  limited the number of visitors they allowed, or because voter registration volunteers and potential voters alike were fearful of participating in close-quarter conversations in public spaces.

16

75.    Understandably, locations like state health centers restricted entry to those without a medical reason to be there and were no longer hospitable places to carry out voter registration.

76.    Many churches where the Network has historically run registration activities (at tables outside after services) moved to online religious services

77.    The Network shut down its in-person meetings, its citizenship school, as well as its entire traditional and Young Voter MVP on March 16.

78.    State and local mandates and recommendations led to the cancellation of many of the large festivals and events MVP volunteers had previously frequented.  The Festival of Black History & Culture went online this year.

79.    MVP's model had relied on face-to-face interaction and it was exceedingly difficult to have potential voters fill out paperwork while maintaining the six-foot distance recommended by public health authorities.

80.    Furthermore, given the demographics of the most experienced MVP volunteers—people who are older and thus at greater risk from the pandemic—the Network could not rely on the same group of staff they had before, since state health officials had recommended that older individuals be especially careful regarding COVID-19.

81.    Further, COVID-19 and state restrictions have meant that the critical voter education and civic engagement work the Network carries out when working with groups of residents of the same community is just not possible.

82.    As studies about what types of voter registration are most effective have shown, "it is the dynamic interaction of authentic person-to-person contact that is most important in

determining whether a method will successfully mobilize voters."[23]  That is precisely what Plaintiff lost.

83.    Practically the only part of the MVP project (until just this week) that was able to continue doing voter registration was the Young Voter MVP project, which went through its own challenges.

84.    While the Network had envisioned the Young Voter MVP program as focused on in-person outreach, for most of the pandemic the only activity has been remote.

85.    Youth volunteer are using phones and computers to reach, register, and engage nonvoters as part of what is now called the "Pandemic Model" MVP.

86.    This required extensive additional training for volunteers and liaisons, which took away from the Network's other priorities.  It also required the Network to acquire a subscription to specialized software that would allow Young Voter MVP staff to do virtual phone-banking, in addition to purchasing Personal Protective Equipment (PPE), cleaning supplies, and similar materials for the little in-person work that could be done.  The MVP developed new health and safety protocols, and trained staff to follow those protocols.

87.    The MVP also started to engage paid staff as liaisons for practically the first time.

88.    Transitioning to a phone-based system of reaching people has presented numerous challenges, ranging from phone lines not working and people not picking up their cell phones and the calls going to voicemail, to people being cautious about whether to trust MVP staff with personal information.

---

[23] Yale Institute for Social and Policy Studies, *Lessons from GOTV Experiments*, *available at* https://isps.yale.edu/node/16698.

89.     The effect of pandemic-related safety measures on registration efforts were quickly apparent.  It is harder to train liaisons and volunteers remotely on voter registration.  And it is even harder to have effective community engagement and civic education without the chance to engage with potential voters face-to-face, as the Network's long-time volunteers have been doing for two decades.

90.     That is particularly the case because the MVP's target audience often needs more detailed information about registration and voting because of their life circumstances: previous convictions, lack of photo ID, no home or transportation.  It takes more time and is more difficult to do registration and voter outreach in these circumstances, especially when these efforts have to take place remotely.

91.     Thus, while investing resources in creating the Pandemic Model was necessary, it has been a meager substitute for in-person registration.  The Network has registered approximately 5% of the number of voters it had anticipated registering in advance of the 2020 presidential election.

92.     Moreover, the resources devoted to developing this model took away resources from the Network's other crucial mission work, including voter mobilization efforts, and community engagement around worker rights, racial justice, and health care.

## IV.    ENFORCEMENT OF THE VOTER REGISTRATION DEADLINE UNDER THESE CONDITIONS SEVERELY BURDENS PLAINTIFF'S FIRST AND FOURTEENTH RIGHTS TO REGISTER VOTERS

93.     South Carolina's initial success in containing the virus raised hopes that a traditional MVP model would be possible in the fall, when voters would in any event be more receptive to the Network's registration and education work.

94.     Unfortunately, the resurgence of COVID-19 infections and the subsequent rollbacks by the state dashed these hopes of returning to the MVP's traditional in-person registration model.

95.     For the Young Voter MVP, the Network's model relied heavily on in-person networking, especially at college campuses.  For instance, the MVP has liaisons at the state's three largest HBCUs, including the presidents of the NAACP College Divisions at Clafflin College and SC State University in Orangeburg, and Benedict College in Columbia.  Those campuses—in addition to state schools like the University of South Carolina—have either not opened or have opened with many students studying remotely.

96.     The Network tested its Young Voters Pandemic Model MVP in Saluda and Fairfield counties this summer using the new remote strategies described above.  It has only recently been able to expand that program to other counties.  Volunteers in Richland and Charleston completed training just last week.

97.     Very recently, some youth volunteers (wearing masks provided by the Network) have started to set up in-person registration tables and done door-to-door canvassing, although even those events are few and far between.

98.     In the Columbia/Fairfield area, some volunteers have finally, in the last two weeks of September, been able to set up registration tables outside schools to register older students and parents.

99.     On September 19, the Network and the SC NAACP organized an in-person event in Columbia with speakers, food, and information stations.  Younger volunteer liaisons have also recently attended the Soda City festival in Columbia to do voter registration.

100.    On September 28, for the first time since March, traditional MVP volunteers set up a table in front of a locked bus station to register voters, and succeeded in registering 21 voters in two hours.

101.    On Sunday, October 4, Young Voter MVP liaisons are going to participate in a "Black Votes Matter" event, where voter registration and community education efforts will take place during a car show.

102.    Such events and efforts could ramp up and would allow the Network to expand its voter registration efforts just as they are getting off the ground, after months of pandemic and state-induced shutdowns.

103.    For instance, volunteers from the traditional MVP have volunteered to staff tables outside the bus station and one of the FQHCs in Columbia every day until the voter registration deadline.

104.    An extension of the Voter Registration Deadline would allow Plaintiff to register a substantial numbers of new voters before the November election.

105.    With more days, the Network could set up traditional MVP in-person voter registration tables outside the bus stations and FQHC's as they successfully did this week to engage with potential voters.  Similarly, it could reach out to additional young Black voters in counties it previously had not approached (e.g., Charleston, Horry, Sumter, Spartanburg and Beaufort) and allow the recently-trained Young Voter MVP staff in Richland and Charleston to use that training to connect to more potential voters.

106.    Enforcement of the Voter Registration Cutoff will frustrate Plaintiff's mission to register as many voters as possible for the 2020 election and thousands of South Carolinians will be denied their right to vote.

107.    Under the pandemic conditions which have been in effect in South Carolina since March 2020, Defendant's enforcement of the Voter Registration Deadline severely burdens Plaintiff's right to register voters in time for the election this year.

## V.    SOUTH CAROLINA CAN EXTEND THE VOTER REGISTRATION CUTOFFS

108.    Any inconvenience the Defendants might experience from an extension of the Voter Registration Cutoff will be minimal due to South Carolina's registration and election process.

109.    Although the SEC has set the three Voter Registration Cutoffs,[24] several exemptions to these deadlines demonstrate that they are not truly the final dates by which South Carolina election officials can accept and process voter registration forms.

110.    For instance, "[i]f the postmark date" on a mailed-in registration form "is missing or illegible, the county board of voter registration and elections must accept the application if it is received by mail" by October 9, one week after the end of in-person registration.  S.C. Code Ann. § 7-5-155(a)(1).

111.    South Carolina law even provides opportunities for certain voters to register up to the day of the election.  Certain former service members in the Armed Forces of the United States are "entitled to register for the purpose of voting in the next ensuing election after the discharge or separation from service, up to 5:00 p.m. on the day of the election"—i.e., November 3—and "must be issued a registration notification stating the precinct in which he is entitled to vote and a certification to the managers of the precinct that he is entitled to vote and should be placed on the registration rolls of the precinct."  S.C. Code Ann. § 7-5-150.

---

[24] *See* South Carolina Election Commission, *Five Days Remain to Get Registered for General Election,* (Sept. 29, 2020), *available at* https://www.scvotes.gov/index.php/five-days-remain-get-registered-general-election.

112.    South Carolina allows in-person absentee voting to begin on October 5, the very same day as the mail-in cutoff.  H5305/R149 of 2020, § 5 ("Beginning on October 5, 2020, each county board of elections and voter registration must provide for in-office absentee voting for the November 3, 2020, General Election.").

113.    As a result, South Carolinians can register to vote online on October 4 and, under South Carolina law, be eligible to cast their ballot by voting absentee the very next day on October 5.

114.    This shows that Defendants need no more than a single day to process registrations before voting.

115.    The state has extended the registration cutoffs in the past in the face of natural disasters, with no measurable effect on its conduct of the election.

116.    For the 2018 general elections, the in-person registration cut-off was October 6, and the mail and online cutoffs were October 7 ("2018 Voter Registration Cutoffs").

117.    In early September 2018, Hurricane Florence made landfall in South Carolina and caused widespread flooding throughout the month of September, leading to the death of nine people.[25]  The Governor of South Carolina declared a state of emergency.[26]

---

[25] Andy Shain, "In a first, SC voter registration deadline extended 10 days after Florence flooding," Post and Courier, (Oct. 2, 2018), *available at* https://www.postandcourier.com/politics/in-a-first-sc-voter-registration-deadline-extended-10-days-after-florence-flooding/article_7b3f98a2-c5cd-11e8-b2d6-3f7634b73cf8.html.

[26] Consent to Order, *State of South Carolina v. Marci Andino,* C/A No. 2018-CP-40-05088 (SC Ct. of Cmn. Pleas, Oct. 2, 2018) at 1, *available at* https://bit.ly/34gTTP1.

118.     After being sued by the state Attorney General of South Carolina, Defendant Andino agreed to extend the 2018 Voter Registration Cutoffs to October 17, 2018—extending the online/mail registration cutoff by 11 days and the in-person cut-off by 10 days.[27]

119.     In approving and entering the agreed-upon consent order, the state court found that "[t]he Legislature did not intend voters to be barred from exercising their constitutional right to vote because a natural disaster has struck the State."[28]

120.     Defendant Andino consented to this extension and apparently suffered no prejudice.[29]

121.     Similarly, in the lead-up to the last presidential election in 2016, the State Election Commission once again allowed for an extension in voter registration cutoffs, this time due to damage caused by Hurricane Matthew.

122.     In 2016, the general election was scheduled for November 8, with the voter registration cutoffs scheduled for October 8.

123.     Hurricane Matthew made landfall in South Carolina in early October 2016.  The State Election Commission extended the mail-in voter registration cutoff to October 11.[30]

124.     On information and belief, this extension to the 2016 mail-in cutoff did not materially prejudice Defendant Andino or the State Election Commission.

125.     Defendants, today, are similarly capable of extending the 2020 Voter Registration Cutoffs to at least October 19 without suffering any prejudice.

---

[27] *Id.*

[28] *Id.* at 5.

[29] *Id.* at 4.

[30] South Carolina Election Commission, *Voter Registration Deadlines Extended,* (Oct. 6, 2016), *available at* https://www.scvotes.gov/node/309.

126.    In fact, in 2007, Defendant Andino informed Brett Bursey, Executive Director of the Network, that the State Election Commission did not require the full 30 days provided for in the law to finalize voter rolls.  This took place in the context of Mr. Bursey proposing legislation that would shorten the restriction on registering voters from 30 days to 21 days.

127.    The SEC also supported changing the voter registration deadline in 2019 in H. 3031, a bill that was introduced into the legislature with the SEC's support and stated its intention was to amend S.C. Code Ann. § 7-5-150 to "change the date on which the registration books must be closed from thirty days before each election to twenty days."  H. 3031, South Carolina General Assembly 123rd Session, 2019-2020.

128.    Thus, there is no state interest—let alone a compelling or convincing interest—in strictly enforcing the current 2020 Voter Registration Cutoffs.

### FIRST CAUSE OF ACTION
#### Severe Undue Burden on the Right to Register Voters in Violation of the First Amendment as Applied to the Voter Registration Deadline during the COVID-19 Pandemic

129.    Plaintiff realleges and incorporates by reference as if fully set forth herein each of the preceding paragraphs and allegations.

130.    The First Amendment, which is applicable to states via the Fourteenth Amendment, prohibits "abridging the freedom of speech."  U.S. Const. amend. I.

131.    The right to vote and the related rights to associate and engage in free speech to register voters and get out the vote are core political rights protected by the First Amendment.

132.    As applied during the ongoing COVID-19 emergency, South Carolina's October 2, 4, and 5 Voter Registration Cutoffs severely burden Plaintiff's ability to exercise core political speech and association rights in voter registration drives in violation of the First Amendment.

25

133.    South Carolina's interest in enforcing the Voter Registration Cutoffs is neither narrowly tailored nor sufficiently compelling to justify the severe burden imposed on Plaintiff's First Amendment rights.

134.    Without an order enjoining Defendants from enforcing the Voter Registration Cutoffs and extending the deadline, Plaintiff will be subject to an unjustifiable burden on its First Amendment rights and will suffer irreparable harm for which there is no adequate remedy at law.

**SECOND CAUSE OF ACTION**
**Severe Undue Burden on the Right to Register Voters**
**in Violation of the Due Process Clause of the Fourteenth Amendment**
**as Applied to the Voter Registration Deadline during the COVID-19 Pandemic**

135.    Plaintiff realleges and incorporates by reference as if fully set forth herein each of the preceding paragraphs and allegations.

136.    The Due Process Clause of the Fourteenth Amendment of the U.S. Constitution provides that "[n]o States shall . . . deprive any person of life, liberty or property, without due process of the law."  U.S. Const. amend. XIV § 1.

137.    The right to vote and the related rights to associate and engage in free speech to register voters and get out the vote are core political rights protected by the Due Process Clause of the Fourteenth Amendment.

138.    As applied during the ongoing COVID-19 emergency, South Carolina's October 2, 4, and 5 Voter Registration Cutoffs severely burden Plaintiff's ability to exercise core political speech and association rights in voter registration drives in violation of the Due Process Clause of the Fourteenth Amendment.

139.    South Carolina's interest in enforcing the Voter Registration Cutoffs is neither narrowly tailored nor sufficiently compelling to justify the severe burden imposed on Plaintiff's Fourteenth Amendment rights.

140.    Without an order enjoining Defendants from enforcing the Voter Registration Cutoffs and extending the deadline, Plaintiff will be subject to an unjustifiable burden on their Fourteenth Amendment rights and will suffer irreparable harm for which there is no adequate remedy at law.

### THIRD CAUSE OF ACTION
### Declaratory Judgment
### (Fed. R. Civ. P. 57 and 28 U.S.C. §§ 2201–02)

141.    Plaintiff realleges and incorporates by reference as if fully set forth herein each of the preceding paragraphs and allegations.

142.    A justiciable case and controversy exists because Defendants' enforcement of the Voter Registration Cutoffs under the pandemic conditions in effect in South Carolina imminently threaten to severely burden Plaintiff's First and Fourteenth Amendment rights to register voters in time for the November 2020 election.

143.    Plaintiff is entitled to a declaratory judgment that Defendant's enforcement of the Voter Registration Cutoffs as applied here under the pandemic conditions in South Carolina is unconstitutional.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

a.    Preliminarily and permanently enjoin Defendants from enforcing the Voter Registration Cutoffs this election cycle;

b.    Order Defendants to extend the Voter Registration Cutoffs to a date no sooner than October 19, 2020;

c.    Declare that enforcement of the Voter Registration Cutoffs as applied under the pandemic conditions in South Carolina is unconstitutional in violation of the First and Fourteenth Amendments;

    d.      Award Plaintiff reasonable attorneys' fees and costs;

    e.      Retain jurisdiction to ensure all Defendants' ongoing compliance with the

foregoing orders; and

    f.      Grant such other and further relief that this Court deems just and appropriate.


Dated: Columbia, NC
      October 2, 2020


**BURNETTE SHUTT MCDANIEL**

By: _____ /s/ Jack E. Cohoon _____

Jack E. Cohoon (Fed. ID No. 9995)
912 Lady Street, 2nd Floor
P.O. Box 1929
Columbia, South Carolina 29202
P:  (803) 850-0912
F:  (803) 904-7910
jcohoon@burnetteshutt.law

**EMERY CELLI
BRINCKERHOFF ABADY
WARD & MAAZEL LLP**


Matthew D. Brinckerhoff*
Jonathan S. Abady*
Debra L. Greenberger*
Ananda V. Burra*
600 Fifth Avenue, 10th Floor
New York, New York 10020
P:  (212) 763-5000
F:  (212) 763-5001
mbrinckerhoff@ecbawm.com
jabady@ecbawm.com
dgreenberger@ecbawm.com
aburra@ecbawm.com

**FREE SPEECH FOR PEOPLE**

John Bonifaz*
Gillian Cassell-Stiga*
Ben Clements*
Ronald Fein*
1320 Centre Street, Suite 405
Newton, Massachusetts 02459
P:  (617) 249-3015
jbonifaz@freespeechforpeople.org
gillian@freespeechforpeople.org
bclements@freespeechforpeople.org
rfein@freespeechforpeople.org

*Attorneys for Plaintiff*

*Motions for admission pro hac vice forthcoming