# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

| | |
|---|---|
| SOUTH CAROLINA PROGRESSIVE NETWORK EDUCATION FUND,<br><br>  Plaintiff,<br><br>v.<br><br>MARCI ANDINO, in her official capacity as Executive Director of the South Carolina State Election Commission; JOHN WELLS, in his official capacity as Chair of the South Carolina State Election Commission; and JOANNE DAY, CLIFFORD J. EDLER, LINDA MCCALL and SCOTT MOSLEY, in their official capacities as members of the South Carolina State Election Commission,<br><br>  Defendants. | Case No.  3:20-cv-03503-MGL |

## PLAINTIFF'S MOTION AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A
## TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

PAGE NO.

PRELIMINARY STATEMENT .................................................................................................1

ARGUMENT .........................................................................................................................4

    I.      PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS ...................................................................................................................6

          A.     The Voter Registration Cutoffs Violate Plaintiff's First and Fourteenth Amendment Rights ................................................................................ 6

          B.     The Burden Imposed by the Voter Registration Cutoffs Is Severe ............ 8

          C.     No State Interest Sufficiently Justifies the Voter Registration Cutoffs .... 20

          D.     Defendants Cannot Justify the Severe Burden on Plaintiff's Constitutional Rights ................................................................................ 21

          E.     Any Inconvenience to the Defendants Will Be Minimal.......................... 25

          F.     Plaintiff Has Standing to Seek an Injunction........................................... 27

    II.     PLAINTIFF FACES IRREPARABLE HARM....................................................28

    III.    THE NARROW ORDER SOUGHT BY PLAINTIFF IS IN THE PUBLIC INTEREST AND WILL NOT HARM THE STATE...........................................29

CONCLUSION.....................................................................................................................32

Plaintiff South Carolina Progressive Network Education Fund (the "Network"), by and through the undersigned attorneys, respectfully moves the Court pursuant to Federal Rule of Civil Procedure 65 for (1) a temporary restraining order enjoining Defendants Marci Andino, in her official capacity as Executive Director of the South Carolina State Election Commission (the "SEC"), John Wells, in his official capacity as Chair of the Commission, and JoAnne Day, Clifford J. Edler, Linda McCall and Scott Mosley, in their official capacities as members of the Commission, and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing voter registration cutoffs required by S.C. Code Ann. § 7-5-150 under the conditions of the COVID-19 pandemic until the Court decides Plaintiff's motion for a preliminary injunction; and (2) a preliminary injunction enjoining these same parties from enforcing voter registration cutoffs required by S.C. Code Ann. § 7-5-150 under the conditions of the COVID-19 pandemic until no sooner than the end of the day on October 19, 2020.

In support of its motion, Plaintiff relies upon the below memorandum of law, and the attached declarations and exhibits.

## PRELIMINARY STATEMENT

Plaintiff is a non-partisan organization committed to expanding the franchise to as many South Carolinians as possible. For years, it has focused on registering voters in-person from historically underrepresented communities of color. This year, however, its voter-registration efforts have been derailed by COVID-19 and the state's actions in responding to the pandemic. Notwithstanding the pandemic, the state's registration cutoffs remain the same: voters must register roughly 30 days in advance of the election or be deprived of their right to vote in that election. This deadline is not administratively necessary: state elections officials had previously *agreed* to extend the deadline for other emergencies and *asked* the legislature to make

1

the cutoff *later* (to no avail).  In the face of a deadly pandemic, and the resultant state actions severely burdening Plaintiff's constitutional right to register voters, the state's rigid and unnecessary deadline cannot withstand constitutional scrutiny.

Plaintiff's staff hit the pavement year after year to register voters at health centers, food banks, homeless shelters, and bus stations, and planned to do the same this year.  Then COVID-19 struck the United States.  In an effort to stop the spread of the virus, the Governor took extraordinary measures.  A state of emergency was declared; schools were closed statewide; large gatherings were forbidden; restaurants, bars, gyms, and movie theaters were closed.  On April 6, the Governor issued a stay-at-home order; even when the order was lifted, the Governor encouraged people to social distance when in public.  Plaintiff's in-person registration efforts basically ended.  Plaintiff worked hard to transition to remote registration but, despite its hard work, without being able to connect to voters face-to-face, it had limited success.

Throughout the summer, Plaintiff held out hope that in September—when, traditionally, voter registration efforts in the state kick into high gear—it would be safe to resume normal in-person work.  But it was not to be: infection rates in South Carolina climbed over the summer, and it continued to be unsafe.  Plaintiff has just started to be able to hold in-person registration events and register new voters in the last two weeks, an exciting development after months of outreach stymied by potential voters who often don't answer their cell phone.

Now, Plaintiff's efforts face another threat.  South Carolina law provides that the voter "registration books shall be closed thirty days before each election."  S.C. Code Ann. § 7-5-150.  For the November 2020 general election, the registration deadline is thus Sunday, October 4, which is also the last day voters can register on the internet, S.C. Code Ann. § 7-5-185(A).  Since in-person registration offices are largely not open on the weekend, the effective

deadline for in-person voter registration in many areas is Friday, October 2.  S.C. Code Ann. § 7-5-130 (voter registration offices open "during the same hours as other county offices are normally open").  Voters may mail their registration paperwork on October 5, so long as their registrations are postmarked on that day.  S.C. Code Ann. § 7-5-155(a)(1).  If South Carolinians are not registered by these dates (the "Voter Registration Cutoffs"), they will lose their right to vote in the November 3 election.  The impending Voter Registration Cutoffs threaten to precipitously end Plaintiff's voter registration efforts at a critical juncture.

There is simply no reason that the Voter Registration Cutoffs need be so far before the election, and, in the face of this unprecedented pandemic, its application is unconstitutional.  South Carolina's cutoff is tied for the strictest in the nation—42 states permit voters to register closer to the election.  Defendants have repeatedly admitted that the Cutoffs are not administratively necessary: the State Election Commission agreed to a consent order extending the deadline by 11 days when the state was hit by a hurricane in 2018; the SEC supported legislation in the general assembly that would make the cutoff later; and Defendant Andino admitted to Plaintiff's Executive Director on another occasion that the cutoff did not need to be as long as 30 days before the election.

Registering citizens to vote involves the expression of core political speech and association rights safeguarded by the First and Fourteenth Amendments.  This year—on the heels of months of state-imposed shutdowns and social distancing—the fast-approaching Voter Registration Cutoffs severely burden Plaintiff's right to register fellow South Carolinians to vote. This Court and courts throughout the nation have recognized that, in the unprecedented circumstances of a nationwide pandemic, rigid pre-existing election laws must give way where they impose an unconstitutional burden on voting rights.  *See, e.g.*, *Middleton v. Andino*, No.

3

3:20-CV-01730-JMC, 2020 WL 5591590 (D.S.C. Sept. 18, 2020), *stay request denied and interim stay vacated*, No. 20-2022 (4th Cir. Sept. 25, 2020) (enjoining enforcement of South Carolina's mail-in absentee ballot witness signature requirement); *Democratic Nat'l Comm. v. Bostelmann*, No. 20 Civ. 249, 2020 WL 5627186, at *17–22 (W.D. Wis. Sept. 21, 2020), *stay request denied and interim stay vacated*, Nos. 20-2835 & 20-2844, 2020 WL 5796311 (7th Cir. Sept. 29, 2020) (ordering the extension of Wisconsin's statutory 2020 general election voter registration and absentee ballot deadlines); *Gallagher v. N.Y. State Bd. of Elections*, 20 Civ. 5504, 2020 WL 4496849, at *16–18, 23 (S.D.N.Y. Aug. 3 2020) (enjoining enforcement of New York's statutory mail-in ballot postmark deadline); *Libertarian Party of Ill. v. Pritzker*, No. 20 Civ. 2112, 2020 WL 1951678, at *2–5 (N.D. Ill. Apr. 23, 2020) (adopting a joint proposed order extending ballot petition signature deadlines where, as applied in combination with COVID-19 restrictions, the effect of the requirements insurmountably burdened plaintiffs).  The Voter Registration Cutoffs are no different.  The Cutoffs are unconstitutional as applied under these circumstances and can be extended until at least October 19 without causing more than a *de minimis* administrative inconvenience to the state.  To avoid an irreversible constitutional injury to Plaintiff and the disenfranchisement of thousands of voters, the Voter Registration Cutoffs must be extended.

## ARGUMENT[1]

Plaintiffs seeking a temporary restraining order or preliminary injunction under Federal Rule of Civil Procedure 65 must "demonstrate that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm, (3) the balance of hardships tips in their favor, and (4) the injunction is in the public interest."  *Pashby v. Delia*, 709 F.3d 307, 320 (4th

---

[1] For a complete recitation of the facts, Plaintiff refers the Court to Plaintiffs' Complaint and the Declaration of Brett Bursey ("Bursey Decl.").

Cir. 2013) (citing *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 20 (2008)).

"Although this inquiry requires plaintiffs seeking injunctions to make a 'clear showing' that they

are likely to succeed at trial, plaintiffs need not show a certainty of success." *Id.* at 321 (quoting

*The Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 345 (4th Cir. 2009),

*vacated on other grounds*, 559 U.S. 1089 (2010)).  A temporary restraining order is evaluated

using the same test as that for a preliminary injunction, although the adverse party need not be

provided with notice, the injunction must be limited in time, and the factual record can be less

fulsome.  *See Accident, Injury & Rehab., PC v. Azar*, 336 F. Supp. 3d 599, 604 (D.S.C. 2018);

*Democratic Nat'l Comm. v. Bostelmann*, 447 F. Supp. 3d 757, 764 (W.D. Wis. 2020).  In

evaluating such a motion, the Court "take[s] judicial notice of official governmental reports and

statistics," including election and voter registration statistics and public health reports from

government agencies.  *United States v. Cecil*, 836 F.2d 1431, 1452 (4th Cir. 1988) (citations

omitted).

   Here, all four elements support granting emergency relief.  As applied during the

ongoing COVID-19 emergency, the Voter Registration Cutoffs severely burden Plaintiff's ability

to exercise core political speech and association rights in its voter registration campaigns.  As a

result, the Voter Registration Cutoffs violate Plaintiff's First and Fourteenth Amendment rights.

Defendants cannot claim any serious harm from the enjoining of unconstitutional behavior and

extension of the Voter Registration Cutoffs and, indeed, have repeatedly admitted that the

Cutoffs are earlier than they need be.  The public interest also weighs strongly in favor of

allowing South Carolinians to exercise their Constitutional rights and expand the voting

franchise.  This Court should grant Plaintiff's motion for a temporary restraining order and a

preliminary injunction.

## I.    PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

Plaintiff has standing and is likely to succeed on its as applied claims that the

Voter Registration Cutoffs, following months of COVID-19-related stay-at-home restrictions and

social distancing measures, severely burden Plaintiff's First and Fourteenth Amendment rights.

### A.    The Voter Registration Cutoffs Violate Plaintiff's First and Fourteenth Amendment Rights

The "central purpose" of voter registration "is to encourage voting, as it is the

most basic tenant of our democracy." *Mullins v. Cole*, 218 F. Supp. 3d 488, 493 (S.D. W. Va.

2016).  "Essential to this process is registering qualified individuals to cast ballots.  For those not

registered to vote, the right to vote is meaningless." *Id.*  A state's election laws, including those

that "govern[] the registration and qualification of voters," inevitably affect "the individual's . . .

right to associate with others for political ends." *Anderson v. Celebrezze*, 460 U.S. 780, 788

(1983).  Courts have routinely determined that voter registration efforts involve core political

speech and association rights protected by both the First Amendment and the Due Process Clause

of the Fourteenth Amendment.[2] *Mullins*, 218 F. Supp. 3d at 493.  These association and political

rights "belong to—and may be invoked by—not just the voters seeking to register, but by third

parties who encourage participation in the political process through increasing voter registration

rolls." *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 698 (N.D. Ohio 2006).

The fast-approaching Voter Registration Cutoffs, as applied to Plaintiff, following

restrictions on Plaintiff's ability to register voters due to COVID-19, violate Plaintiff's First and

Fourteenth Amendment rights and threaten to disenfranchise potentially thousands of voters in

South Carolina.

---

[2] *See NAACP v. Alabama*, 357 U.S. 449, 460 (1958) ("It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech.").

Challenges to state election laws that burden constitutional rights are analyzed under the *Anderson-Burdick* balancing test, which courts use to "weigh the 'character and magnitude' of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (citing *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)).  Courts considering such challenges must carefully balance the character and magnitude of injury to the rights that a plaintiff seeks to vindicate against the justifications put forward by the state for the burdens imposed.  *See Burdick*, 504 U.S. at 434; *Anderson*, 460 U.S. at 789.  "The rigorousness of [the court's] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434.  Laws that impose "severe restrictions" must be "narrowly drawn to advance a state interest of compelling importance," while "reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters" may be justified by a showing of "important regulatory" state interests. *Id.* (quotations marks and citations omitted); *see also Fusaro v. Cogan*, 930 F.3d 241, 257 (4th Cir. 2019).

Yet, "[h]owever slight th[e] burden [on the right to vote] may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (quotation marks and citations omitted).  Thus, even "a regulation which imposes only moderate burdens could well fail the *Anderson* balancing test when the interests that it serves are minor, notwithstanding that the regulation is rational." *McLaughlin v. N. Carolina Bd. of Elections*, 65 F.3d 1215, 1221 n.6 (4th Cir. 1995).  Moreover, a court need not

accept a state's justifications at face value, particularly where those justifications are "speculative," otherwise it "would convert *Anderson-Burdick*'s means-end fit framework into ordinary rational-basis review wherever the burden a challenged regulation imposes is less than severe." *Soltysik v. Padilla*, 910 F.3d 438, 448–49 (9th Cir. 2018); *see McLaughlin*, 65 F.3d at 1221 n.6.

Here, South Carolina "ha[s] an important interest in *promoting* voter participation in the electoral process." *Greenville Cnty. Republican Party Exec. Comm. v. South Carolina*, 824 F. Supp. 2d 655, 671 (D.S.C. 2011) (emphasis added). "The right to vote freely for the candidate of one's choice is the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims,* 377 U.S. 533, 555 (1964). "States must seriously undertake their obligation to protect the rights of individual voters to cast a meaningful ballot." *Greenville Cnty. Republican Party Exec. Comm.*, 824 F. Supp. 2d at 671-72.

## B.    The Burden Imposed by the Voter Registration Cutoffs Is Severe

As applied during a now seven-month-long pandemic, the Voter Registration Cutoffs severely burden Plaintiff's association and political speech rights, triggering exacting review under *Anderson-Burdick*. *See Esshaki v. Whitmer*, 813 Fed. App'x 170, 171 (6th Cir. 2020) ("[T]he district court properly applied the *Anderson-Burdick* test" and "correctly determined that the combination of the State's strict enforcement of the ballot-access provisions and the Stay-at-Home Orders imposed a severe burden on plaintiffs' ballot access, so strict scrutiny applied"). This Court and others have taken the COVID-19 pandemic and, in years past, hurricanes, into account when determining that applying an election law imposes an unconstitutional burden on voting rights. *See, e.g.*, *Middleton*, No. 20 Civ. 01730 (JMC), 2020 WL 5591590 (enjoining enforcement of South Carolina's absentee ballot witness signature

requirement); *Libertarian Party of Ill.*, No. 20 Civ. 2112, 2020 WL 1951687 (N.D. Ill. Apr. 23, 2020) (applying *Anderson-Burdick* balancing in light of pandemic, and alleviating signature and witnessing requirements for candidates running for office); *Esshaki*, 813 Fed. App'x at 171 (affirming conclusion that enforcement of signature requirement for candidates was "not narrowly tailored to the present circumstances" involving pandemic); *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1257 (N.D. Fla. 2016) (holding that, because a hurricane "foreclosed the only methods of registering to vote" in the final week of registration, the statutory deadline "severe[ly] burden[ed] the right to vote"); *Ga. Coal. for the Peoples' Agenda, Inc. v. Deal*, 214 F. Supp. 3d 1344, 1345-46 (S.D. Ga. 2016) (similar).

Plaintiff's "mission is to promote — through education and action — human, civil, and workers' rights, reproductive freedom, environmental protection, and government reform," Bursey Decl. ¶ 2, and "integral" to this mission "ensuring the substantive engagement of all citizens in the civic affairs of state and local governments, including by educating people about voting and registering people to vote," *id.* ¶ 3. For years, in coordination with the South Carolina National Association for the Advancement of Colored People ("SC NAACP"), Plaintiff has run the Missing Voter Project ("MVP") to educate people—especially in low wealth communities of color—around public policies and voting, and to register people to vote. *Id.* ¶ 4. The MVP is one of the few nonpartisan and year-round voter registration initiatives in South Carolina. *Id.* ¶¶ 5-6. It has had significant success: in the hotly contested 2008 election cycle, it "registered over 5,800 people in the Columbia area alone with fewer than 20 volunteers." *Id.* ¶ 8. With an expanded program of planned registration locations and activities, and the high level of interest in the elections this year, the MVP expected to "easily register 10,000 voters" in 2020. *Id.* ¶ 9.

The MVP's model has focused on registering people to vote at "federally qualified health centers (FQHC's are qualified to receive Medicare reimbursement for indigent patients without insurance regardless of age), food banks, homeless shelters, and bus stations." *Id.* ¶ 7. Plaintiff's volunteers have for many years attended local festivals where people of color attend. Until this year, Plaintiff "regularly had a table to register voters at the annual Jubilee: Festival of Black History & Culture, the Cornbread Festival, Lower Richland's SwampFest, as well as HBCU (Historically Black Colleges and Universities) football games and social events." *Id.* ¶ 11. It has also organized its own events for voter registration, including a "Cookout & Shout-out for Democracy" in 2018. *Id.* ¶ 12. Working in these contexts allows MVP to fulfil its "mission of engaging citizens in the civic life of their local communities." *Id.* ¶ 13.

Leading up to the 2020 elections, Plaintiff and its partners planned to expand their efforts to reach out to their target communities by scaling up their time-tested MVP project and engaging in new forms of outreach. *Id.* ¶¶ 14-16. Volunteers would man the traditional MVP locations—"local events and high pedestrian traffic areas"—and would seek to expand to even more Federally Qualified Health Centers, their satellite facilities, and Regional Transit Authorities. *Id.* ¶ 16. In addition to this, Plaintiff planned to debut a new "Young Voter MVP," which would focus on "young people in low wealth communities of color" who have historically "been grossly underrepresented among voters." *Id.* ¶ 15. This initiative involved "peer-to-peer engagement" with young Black civically-engaged volunteers and liaisons reaching out through their own social networks to encourage their peers, newly eligible potential voters, to register and vote. *Id.* ¶¶ 15, 40. All of this work was planned to scale up in earnest in September after Labor Day, when, in Plaintiff's long experience, registration work really becomes effective. *Id.* ¶¶ 17-18.

Enter COVID-19.  South Carolina saw its first two cases on March 6, 2020.
Compl. ¶ 30.  By March 24, Charleston had issued a stay-at-home order requiring people to stay
indoors as much as possible.  *Id*. ¶ 31.  Governor McMaster declared a state of emergency in
early March and, between then and the present, issued several executive orders closing schools,
bars, restaurants, and other business, prohibiting gatherings of 10 or more people, and requiring
residents to engage in social distancing and "remain[] at home whenever possible."  Exec. Order
2020-21 (Apr. 6, 2020); *Id*. ¶ 33.

This unprecedented closure of public life and mandated social distancing hit voter
registration efforts hard, as the Network's volunteers found themselves unable to exercise their
expressive and association rights to register voters without running afoul of the Governor's
orders, county and city restrictions, CDC guidance, and the rapidly emerging public health
consensus.  Plaintiff had to cancel their "in-person meetings," the "citizenship school," "as well
as [their] entire traditional and Young Voter MVP on March 16."  Bursley Decl. ¶ 21.  "[P]eople
were instructed to maintain physical distances of six feet from each other, making it difficult for
[the Network and its volunteers] to meet with potential voters and help them fill out their voter
registration paperwork."  *Id*. ¶ 26.  The MVP's traditional go-to locations were largely
inaccessible.  Bus stations were closed, *id.* ¶ 29, churches moved their services online, *id*. ¶ 31,
and healthcare facilities understandably restricted access to only those people who had a medical
reason to be there, *id*. ¶ 30.  "Events and festivals were cancelled or moved online."  *Id*. ¶ 28.
"[T]he Jubilee: Festival of Black History & Culture, in Columbia South Carolina went online
this year and [the Network and its volunteers] were not able to register voters" there.  *Id.*

Older people, people with pre-existing conditions, and people of color have been
found to be at particular risk of serious complications from the virus.  Compl. ¶¶ 48-50.  Many of

the Network's "most experienced and dedicated volunteers—who have been engaged in this work for decades—are at the highest risk from the virus." Bursley Decl. ¶ 38. Thus, even when there were no prohibitions to engaging in voter registration *per se*, "voter registration volunteers and potential voters alike were fearful of participating in close quarter conversations in public spaces." *Id*. ¶ 27.

By mid-spring, there were hopes that the spread of the virus had slowed and that the state might expect a total of a few hundred deaths due to the virus by August. Compl. ¶ 35. On May 21, 2020, the Governor issued an executive order authorizing certain businesses "previously deemed 'non-essential'" to re-open with conditions, including arcades, selected tourist attractions, bingo halls, public playgrounds, and sports activities that "involve interaction in close proximity to and within less than six (6) feet of another person." Exec. Order 2020-37 (May 21, 2020); Compl. ¶ 37. Plaintiff hoped that it would "be able to return to full voter registration capacity over the summer." Bursley Decl. ¶ 21; *id.* ¶ 46.

The virus returned in force, however, and the state recorded over 12,000 cases and 500 deaths by June 1. Compl. ¶ 39. By July 9, the state had more than 50,000 cases and almost 900 deaths, *id*. ¶ 41; the Governor started to reinstate emergency measures on businesses.[3] By the end of that month, the state had over 85,000 cases and over 1,500 deaths. Compl. ¶ 35. By mid-August, South Carolina had more than 100,000 cases and 2,000 deaths. *Id.* My mid-September, the state had over 130,000 cases and over 3,000 deaths. *Id*. Governor McMaster renewed the state of emergency most recently on September 24, repeatedly invoking the "extraordinary measures" the state was going to have to take to combat the virus, including by continuing to encourage social distancing. Exec. Order 2020-62 (September 24, 2020); Compl.

---

[3] *See South Carolina Announces Latest COVID-19 Update (July 9, 2020),*
https://scdhec.gov/news-releases/south-carolina-announces-latest-covid-19-update-july-9-2020.

¶ 47.  Colleges—which could have been the locus for organizing work—have offered classes online and "college students who would be newly-eligible to be voters are studying remotely." Bursley Decl. ¶ 48.  Plaintiff has liaisons at the state's three largest HBCUs—Clafflin College, SC State University, and Benedict College—but those liaisons are now living remotely, their classes are online, and their peers are studying remotely.  *Id.* ¶ 53.

Over the summer, in response to the state's guidance and the public health consensus, the Network re-tooled its Youth MVP initiative to try and reach out to voters via phones and computers in what it calls its "Pandemic Model."  *Id*. ¶¶ 34-35.  Plaintiff had to divert resources away from its other activities and focus its attention on training less-experienced Young Voter MVP staff on remote voter engagement.  *Id.*  ¶¶ 36-38.  The Network acquired "a subscription to a software program that allows the Young Voter MVP staff and volunteers to do virtual phone-banking," purchased Personal Protective Equipment and cleaning supplies, developed new health and safety protocols, and trained staff in these protocols.  *Id.* ¶ 37.  It had to hire and pay liaisons for the Young Voter MVP project and could not rely solely on volunteers.  *Id.* ¶ 39.  It piloted this new Pandemic Model in Saluda and Fairfield counties.  *Id.* ¶ 42.

Although valiant, Plaintiff's pandemic efforts have been a poor substitute for traditional voter outreach.  Not only has it been hard to train liaisons and volunteers remotely, "it is even harder to have effective community engagement and civic education without the chance to engage with potential voters face-to-face," as the Network has "been doing for two decades." *Id.* ¶ 41.  The challenges are severe for MVP's target audience, people who "often need[] more detailed information about registration and voting because of their life circumstances: previous convictions, lack of photo ID, no home or transportation."  *Id.*  "MVP had never contacted voters

to register them over the phone prior to the pandemic" and volunteers soon found that people were not responding to their phones, were cautious about giving information over the phone, or felt inundated with calls from partisan campaigns. *Id.* ¶ 43. As studies about what types of voter registration are most effective have shown, "it is the dynamic interaction of authentic person-to-person contact that is most important in determining whether a method will successfully mobilize voters."[4] That is precisely what Plaintiff lost. The Network estimates that it has registered approximately 5% of the number of voters it anticipated registering in advance of the November 3 election, Bursey Decl.. ¶ 52, and that it is "months behind" in its registration efforts, *id.* ¶ 61.

Very recently, Plaintiff and its volunteers have been able to carry out more traditional in-person MVP work. "[T]he traditional MVP project had its first in-person registration since the pandemic began" in front of a locked bus station on Monday, September 28, and registered 21 voters in two hours. *Id.* ¶ 57. "Volunteers from [the Network's] traditional MVP have also volunteered to staff tables outside the bus station and one of the [Federally Qualified Health Centers] in Columbia daily until the voter registration deadline." *Id.*

Plaintiff has also expanded its Pandemic Model to include two more counties—Richland and Charleston—but the volunteers there were only able to be trained six days before the October 2 registration deadline. *Id.* ¶ 51. Some youth volunteers, wearing masks provided by the Network, "have set up in-person registration tables and done door-to-door knocking as part of the Young Voter MVP." *Id.* ¶ 44. "In the Columbia/Fairfield area, for instance, some volunteers have finally, in the last two weeks of September, been able to set up registration tables outside schools to register older students and parents." *Id.* ¶ 49. "The Network and the SC

---

[4] Yale Institute for Social and Policy Studies, *Lessons from GOTV Experiments*, https://isps.yale.edu/node/16698.

14

NAACP organized an in-person event in Columbia on September 19 with speakers, food, and information stations," staffed by "lower-risk younger volunteers and liaisons." *Id.* ¶ 58. These liaisons "have also recently attended the Soda City festival in Columbia to do voter registration." *Id.* "On Sunday, October 4, [the Network's] Young Voter MVP liaisons are going to participate in a 'Black Votes Matter' event, where voter registration and community education efforts will take place during a car show." *Id.* ¶ 64.

South Carolina's Voter Registration Cutoffs threaten to end Plaintiff's activities. "Like [the pandemic], the voter registration deadline" is "also approach[ing] and b[earing] down" on the state of South Carolina. *Scott*, 215 F. Supp. 3d at 1254. Strict enforcement of the Voter Registration Cutoffs following South Carolina's many months of COVID-19 emergency orders, requiring social distancing and related restrictions, imposes a severe burden on Plaintiff's constitutional rights, triggering exacting review under *Anderson-Burdick*. *See Esshaki*, 813 Fed. App'x at 171 ("[T]he district court properly applied the *Anderson-Burdick* test" and "correctly determined that the combination of the State's strict enforcement of the ballot-access provisions and the Stay-at-Home Orders imposed a severe burden on plaintiffs' ballot access, so strict scrutiny applied."). If the deadline were extended, Plaintiff would be able "set up traditional MVP in-person voter registration" stations in front of bus stations and health centers, as its volunteers successfully did this week. Bursey Decl. ¶ 65. It could expand its outreach through "newly-trained Young Voter MVP staff." *Id.* Most importantly, an extension would allow additional people "to exercise their fundamental right to vote and participate in our democracy." *Id.*

Although the pandemic itself is extraordinary, the severe burden Plaintiff faces is hardly without precedent. Courts in the Fourth Circuit and beyond have held that, when paired

with devastating emergency circumstances, a rigid statutory electoral cutoff date severely

burdens plaintiffs' constitutional rights.  This year alone, several courts have extended states'

statutory voter registration, ballot petition signature, and mail-in ballot deadlines after finding

that they severely burdened individuals' constitutional rights, as applied in the context of the

unprecedented impact of the COVID-19 pandemic.  *See, e.g.*, *Cegavske*, 2020 WL 2798018, at

*14–16 (applying modified *Anderson-Burdick* test and ordering Nevada to extend its statutory

ballot initiative petition deadline, which impermissibly inhibited plaintiffs' First Amendment

rights, as applied during COVID-19); *Democratic Nat'l Comm. v. Bostelmann*, No. 20 Civ. 249,

2020 WL 5627186, at *17–22 (W.D. Wis. Sept. 21, 2020), *stay request denied and interim stay

vacated*, Nos. 20-2835 & 20-2844, 2020 WL 5796311 (7th Cir. Sept. 29, 2020) (ordering the

extension of Wisconsin's statutory 2020 general election voter registration and absentee ballot

deadlines which, in light of COVID-19, substantially burden plaintiffs' constitutional rights);

*Esshaki*, 813 Fed. App'x at 171 (applying *Anderson-Burdick* and upholding the district court's

preliminary injunction prohibiting enforcement of Michigan's ballot petition signature deadline,

which imposed severe burden during COVID-19); *Gallagher v. N.Y. State Bd. of Elections*,

No. 20 Civ. 5504, 2020 WL 4496849, at *16–18, 23 (S.D.N.Y. Aug. 3 2020) (applying

*Anderson-Burdick* and enjoining New York to disregard its statutory mail-in ballot postmark

deadline, which "in light of the ongoing COVID-19 pandemic" imposed an "exceptionally

severe" burden on plaintiffs); *Libertarian Party of Ill.*, 2020 WL 1951678, at *2–5 (adopting a

joint proposed order extending ballot petition signature deadlines where, as applied in

combination with COVID-19 restrictions, the effect of the requirements insurmountably

burdened plaintiffs); *Goldstein v. Sec'y of the Commonwealth*, 484 Mass. 516, 525 (Mass. 2020)

(applying state *Anderson-Burdick* equivalent and ordering Massachusetts to extend deadlines for

submission of nominating papers where statutory requirements imposed a severe burden on plaintiffs' rights, as applied during COVID-19).  Beyond the COVID-19 context, courts have also granted preliminary injunctive relief where statutory voter registration deadlines severely burdened constitutional rights in the wake of a natural disaster.  *See Scott*, 215 F. Supp. 3d at 1257 (statutory voter registration cutoff date, as applied in the wake of hurricane-related emergency restrictions and closures, likely severely burdened individuals' right to vote); *Ga. Coal. for the People's Agenda, Inc. v. Deal*, 214 F. Supp. 3d 1344, 1345–46 (S.D. Ga. 2016) (registration deadline extended in light of hurricane-related emergency restrictions).

*Cegavske*, a recent District of Nevada decision, is particularly instructive here.  In *Cegavske*, as in this case, plaintiffs brought an as-applied challenge to a state statutory election filing deadline.  *Cegavske*, 2020 WL 2798018, at *1.  The organizational plaintiff in *Cegavske*, Fair Maps Nevada ("FMN"), like Plaintiff the Network, engaged in core First Amendment election-related organizing activity—in FMN's case, by collecting signatures in support of a ballot initiative.  *Id.* at *3, 11.  FMN's signature-gathering activity involved the same sort of close human contact required for the Network to help voters fill out registration forms.  FMN had a robust organizing operation before the emergence of COVID-19 in the state, *id.*, much like the Network.  Nevada's Governor, like South Carolina's, took drastic measures to combat the spread of COVID-19, including declaring a state of emergency, issuing a stay-at-home order, and forbidding group gatherings outside of the home.  *Id.* at *3.  Nevadans, like South Carolinians, were required to stay at home under the Governor's executive orders.  *Id.*

The Nevada stay-at-home orders and social distancing restrictions in *Cegavske* "effectively barred [FMN] from circulating their initiative petition for signature" throughout the stay-at-home order, *id.* at *1, meaning FMN, like the Network, found its electoral organizing

efforts hamstrung.  FMN filed suit and argued that, among other things, Nevada's statutory filing

deadline, as applied in concert with Nevada's COVID-19 restrictions, "made collecting

signatures in-person prohibitive and even dangerous—so the Secretary [of State] should extend

the Deadline." *Id.* at *4.  The *Cegavske* court agreed and held that the Secretary of State's

refusal to extend the filing deadline and waive in-person petition signature requirements

"significantly inhibited [FMN's] chances of collecting the threshold signatures to qualify their

initiative," *id.* at *14, and therefore violated FMN's First Amendment rights.[5]  *Id.* at *15.  The

court then issued a preliminary injunction declaring the statutory deadline unconstitutional and

directing the Nevada Secretary of State to extend the deadline.  *Id.* at *16–18.

       Plaintiff finds itself in a strikingly similar situation here: following months of

stay-at-home orders, mandated social distancing, and related COVID-19-restrictions, Plaintiff

was finally able to safely begin to restart in-person voter registration, only to find that their

constitutionally protected voter registration activities imminently severely burdened—and

imminently to be halted—by South Carolina's fast-approaching Voter Registration Cutoffs.

Bursey Decl. ¶¶ 51-65.  The public health threat posed by COVID-19 cannot be enjoined or

restrained, but the Voter Registration Cutoffs as applied in these pandemic circumstances are

subject to this Court's constitutional scrutiny.  Only the relief ordered in *Cegavske* and the many

other cases cited above—an injunction and extension of the deadline—will relieve Plaintiff of

the severe burden imposed by the Voter Registration Cutoffs.

---

[5] Because *Cegavske* challenged a deadline created by statutes that implement Nevada's ballot
initiative process, the court applied the Ninth Circuit's test in *Angle v. Miller*, 673 F.3d 1122 (9th
Cir. 2012), which "took what is basically the *Anderson-Burdick* framework and applied it to the
specific context of Nevada's initiative process for amending the Nevada Constitution."
*Cegavske*, 2020 WL 2798018, at *11.  The standard in *Angle* is functionally identical to
*Anderson-Burdick*.  *See id.* at *14 (applying *Angle* and weighing whether Nevada's statute
providing the submission deadline is narrowly tailored to advance a compelling state interest to
survive First Amendment scrutiny).

As Defendants' own statistics show, South Carolina is likely to see tens of thousands of fewer additional voters registered this year than in previous presidential years, almost certainly due to the pandemic.  This reduction is starkest when looking at the interval between in late February (when the presidential preference primaries occur), and the totals at election day, a period which in 2020 almost perfectly overlaps with the COVID-19 pandemic.  In 2016, an additional 191,697 voters registered between the Democratic Party's presidential preference primaries on February 26 and election day.[6]  In 2020, there have so far been only 77,629 additional voters registered in the state since the Democratic Party's presidential preference primary in late February.[7]  The disenfranchisement of thousands unquestionably qualifies as a severe burden. *See Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012) (disqualified provisional ballots that constituted less than 0.3% of total votes inflicted "substantial" burden on voters); *Ga. Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1264 (N.D. Ga. 2018) (severe burden existed where 3,141 individuals were ineligible to register).  Indeed, as the Fourth Circuit has held, the "basic truth [is] that even one disenfranchised voter—let alone several thousand—is too many." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014).

---

[6] There were 2,961,824 voters registered in South Carolina at the time of the February 26, 2016 Democratic Party Presidential Preference Primary. *Voter History Statistics for Recent SC Elections,* South Carolina 2016 Presidential Preference Primary Democratic, https://www.scvotes.gov/cgi-bin/scsec/vothist?election=vhppd16&regvote=VOT.  There were 3,153,521 voters registered at the time of the 2016 presidential elections, on November 8, 2016. *Voter History Statistics for Recent SC Elections,* South Carolina 2016 General Election, https://www.scvotes.gov/cgi-bin/scsec/vothist?election=vhgen16&regvote=VOT.
[7] There were 3,292,677 voters registered at the time of the 2020 Democratic primary on February 29, 2020. *Voter History Statistics for Recent SC Elections,* South Carolina 2020 Presidential Preference Primary Democratic, https://www.scvotes.gov/cgi-bin/scsec/vothist?election=vhppd20&regvote=VOT.  As of October 1, 2020, there were 3,370,306 registered voters in South Carolina. *South Carolina Voter Registration Demographics Statewide,* https://www.scvotes.gov/cgi-bin/scsec/96vr?countykey=ALL&D1=ALL.

C.    **No State Interest Sufficiently Justifies the Voter Registration Cutoffs**

Given the likelihood of the substantial burden on Plaintiff's First and Fourteenth Amendment rights, Defendants must come forward with evidence of an interest that is sufficiently compelling to justify burdening Plaintiff's rights by enjoining the arbitrary Voter Registration Cutoffs.  Defendants cannot provide sufficient justification here given the limited inconvenience to Defendants, particularly in light of their previous admissions that the Cutoffs— cutoffs that are among the very earliest in the nation—are earlier than they need be to process registration paperwork.

The state must "present *actual evidence* supporting its assertion that a speech restriction does not burden substantially more speech than necessary; argument unsupported by the evidence will not suffice to carry the government's burden."  *Reynolds v. Middleton*, 779 F.3d 222, 229 (4th Cir. 2015) (emphasis added); *see also Bruni v. City of Pittsburgh*, 824 F.3d 353, 372 (3d Cir. 2016) (noting Supreme Court's clarification of the "rigorous and fact-intensive nature" of the "narrow-tailoring analysis").  Where, as here, the state officials in question have admitted to the minimal inconvenience they would face in disapplying state laws that burden voting rights, *see infra* Section I.D, the *Anderson-Burdick* test counsels finding the restrictions constitutionally infirm, *Middleton*, 2020 WL 5591590, at *32 (finding Defendant Andino's public statements about the capacity of the state to modify absentee ballot laws highly relevant in finding the laws constitutionally infirm in the midst of a pandemic); *Harding v. Edwards,* No. 20 Civ. 495, 2020 WL 5371350, at *3 (M.D. La. Sept. 7, 2020) (noting the Louisiana Secretary of State's public comments were relevant to the court's political question analysis); *League of Women Voters of Va.*, 2020 WL 4927524, at *14 (explaining the Virginia State Board of Elections, which sought to suspend the witness requirement, "actually has experience in enforcing Virginia's absentee ballot scheme and investigating Virginia election fraud").

In fact, in an opinion announced on September 30, 2020, concurring in the Fourth

Circuit's denial of a stay on this Court's preliminary injunction preventing the enforcement of

the witness signature rule in absentee ballots, Judge King stated with no hesitation that it is

inappropriate for a court to "unquestioning[ly] accept[] . . . the State's dubious justification" for

measures that would "make voting harder." *Middleton v. Andino*, No. 20-2022, Dkt. No. 43, at

7 n.* (4th Cir. Sept. 30, 2020) (King, J., concurring).

### D.    Defendants Cannot Justify the Severe Burden on Plaintiff's Constitutional Rights

Any administrative inconvenience Defendants may experience as a result of an

extension of the Voter Registration Cutoff is insufficient to justify imposing a severe burden on

Plaintiff's constitutional rights.  "While [inconvenience] is a valid governmental interest," it is

not "compelling under the circumstances here—during an unprecedented pandemic." *Cegavske*,

2020 WL 2798018, at *15.  Nor is such burden sufficient to disenfranchise voters by their

thousands.  *See Taylor v. Louisiana*, 419 U.S. 522, 535 (1975) (holding "administrative

convenience" cannot justify practices that impinge upon fundamental rights); *see also Ga. Coal.

for People's Agenda, Inc.*, 347 F. Supp. 3d at 1268 (holding increased administrative burden of

"disseminating information" and "training poll managers. . . is minimal compared to the potential

loss of a right to vote"); *United States v. Georgia*, 892 F. Supp. 2d 1367, 1377 (N.D. Ga. 2012)

("The potential hardships that Georgia might experience are minor when balanced against the

right to vote, a right that is essential to an effective democracy."); *Fla. Democratic Party v.

Detzner*, No. 16 Civ. 607, 2016 WL 6090943, at *8 (N.D. Fla. Oct. 16, 2016) ("Any potential

hardship [to the state] imposed by providing the same opportunity . . . for [ ] voters pales in

comparison to that imposed by unconstitutionally depriving those voters of their right to vote and

to have their votes counted.").

"A state is in no way harmed by the issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (quotation marks and citation omitted)). Simply put, the public interest is served when "as many qualified voters as possible" can vote. *League of Women Voters of N.C.*, 769 F.3d at 247-48; *see also* Op. S.C. Att'v Gen., 1996 WL 679459 (S.C.A.G. Oct. 11, 1996) (opining that, "when there is any doubt as to how a statute is to be interpreted and how that interpretation is to be applied in a given instance, it is the policy of this Office to construe such doubt in favor of the people's right to vote"); *South Carolina v. United States*, 898 F. Supp. 2d 30, 35–36 (D.D.C. 2012) ("The Attorney General of South Carolina and Ms. Andino have emphasized that a driving principle both at the polling place and in South Carolina state law more generally is erring in favor of the voter.").

Defendants have in fact recognized that limitations on registration can act to severely burden the right to vote and have waived enforcement of S.C. Code Ann. § 7-5-150 in prior general elections, demonstrating that they could do so again in 2020. For the 2018 general elections, the in-person registration cut-off was October 6, and the mail and online cutoffs were October 7 ("2018 Voter Registration Cutoffs"). *State of South Carolina v. Marci Andino*, C/A/ No. 2018-CP-40-05088 (SC Ct. of Cmn. Pleas, Oct. 2, 2018) at 1-2 (Exhibit A to Declaration of Jack E. Cohoon) ("*State of South Carolina v. Andino*"). In early September 2018, Hurricane Florence made landfall in South Carolina and caused widespread flooding throughout the month

of September.  *Id*.  The Governor of South Carolina declared a state of emergency and nine

people died in the storm.  *Id*.[8]

      After being sued by the state Attorney General of South Carolina, Defendant

Andino agreed to extend the 2018 Voter Registration Cutoffs to October 17, 2018—extending

the online/mail registration cutoff by 11 days and the in-person cut-off by 10 days.  *State of*

*South Carolina v. Andino*, at 1.  In approving and entering the agreed-upon consent order, the

state court found that "[t]he Legislature did not intend voters to be barred from exercising their

constitutional right to vote because a natural disaster has struck the State."  *Id.* at 5.  Defendant

Andino consented to this extension and apparently suffered no prejudice.  *Id.* at 4.  In fact, State

Election Commission had also extended voter registration deadlines in the 2016 election due to

Hurricane Matthew, albeit by a shorter period of time, without being ordered to do so by a court.

*See* South Carolina Election Commission, *Voter Registration Deadlines Extended,* (Oct. 6,

2016), https://www.scvotes.gov/node/309.

      The extension of the 2018 and 2016 Voter Registration Cutoffs is consistent with

cases from Florida and Georgia arising from Hurricane Matthew, where courts weighed extended

voter registration deadlines and found that any administrative inconvenience was insufficient to

justify burdening plaintiffs' constitutional rights.  *See State of South Carolina v. Andino,* at 6-7.

Just five days prior Florida's and Georgia's October 11, 2016 voter registration deadline,

Hurricane Matthew made landfall in both states.  *See generally*, *Scott*, 215 F. Supp 3d 1250;

*Deal*, 214 F. Supp. 3d 1344.  In both cases, the courts granted the organizational plaintiffs'

requests for a temporary restraining order and directed the respective defendants to extend the

---

[8] Andy Shain, *In a first, SC voter registration deadline extended 10 days after Florence flooding,*
Post and Courier, (Oct. 2, 2018), https://www.postandcourier.com/politics/in-a-first-sc-voter-
registration-deadline-extended-10-days-after-florence-flooding/article_7b3f98a2-c5cd-11e8-
b2d6-3f7634b73cf8.html

voter registration deadlines.  *Scott*, 215 F. Supp. 3d at 1258–59; *Deal*, 214 F. Supp. 3d at 1345-46.

Both the *Scott* and *Deal* courts granted plaintiffs' requests for relief even though the extension presented administrative difficulties to the defendants.  *See Scott*, 215 F. Supp. 3d at 1258; *Deal* 214 F. Supp. 3d at 1345–46.  Weighing Floridians' constitutional rights against the state's "administrative convenience," the *Scott* court reasoned that it would be "nonsensical to prioritize [voter registration] deadlines" over constitutional rights, "especially given the circumstances" of the state of emergency.  *Scott*, 215 F. Supp. 3d at 1258.  Likewise, in *Deal*, the court noted that the defendants' "administrative hurdles pale[d] in comparison to the physical, emotional, and financial strain [individuals] faced in the aftermath of [the] Hurricane."  *Deal*, 214 F. Supp. 3d at 1345; *see also Carey v. Population Servs. Int'l*, 431 U.S. 678, 691 (1977) ("[T]he prospect of additional administrative inconvenience has not been thought to justify invasion of fundamental constitutional rights.").  Under emergency situations, affording impacted individuals extra time to register to vote is "small consolation on behalf of their government."  *Deal*, 214 F. Supp. 3d at 1345–46.

Precisely the same relief is appropriate here, where Plaintiff and South Carolina have faced a decidedly greater emergency—both in duration and community impact—than a single hurricane.  Where nine South Carolinians died in Hurricane Florence—a tragedy, no doubt—the state has lost roughly, on average, twice as many people *every single day* since the start of the pandemic.[9]  If Defendants were capable of extending the voter registration cutoffs without issue in 2018 (and also extending them in 2016), there is no basis for them not to extend the Cutoffs in 2020.

---

[9] The state has seen over 3,350 deaths since the start of the pandemic in the state in March 2020, and 122 people in the last week.  Compl. ¶¶ 44-45.

In fact, as Defendant Andino informed Brett Bursey, Executive Director of the Network, the State Election Commission did not require 30 days to finalize voter rolls. Bursey Decl. ¶ 68. The SEC supported legislation in 2019, *id.* ¶ 70, that intended to amend S.C. Code Ann. § 7-5-150 to "change the date on which the registration books must be closed from thirty days before each election to twenty days," H. 3031, South Carolina General Assembly 123rd Session, 2019-2020, (Exhibit A to Bursey Decl.).

As noted *supra*, tens of thousands of voters risk being disenfranchised. No administrative inconvenience could outweigh that need. As the court concluded in *Cegavske*: "If there is any time where business as usual is impossible, this is it. Thus, the Court does not find severe inconvenience a compelling government interest given these extraordinary circumstances." 2020 WL 2798018, at *15. The *Anderson-Burdick* balancing test favors Plaintiff.

### E.    Any Inconvenience to the Defendants Will Be Minimal

Consistent with the state's repeated admissions that the Voter Registration Cutoff could be later, South Carolina's registration and election process evidence that the state has the capacity to process registrations submitted less than 30 days prior to election day.

*First*, the state is already required to process certain categories of overseas voter registrations as late as 5:00 p.m. on election day, belying any claim by Defendants that South Carolina is unable to accept new registrations after the Voter Registration Cutoffs.[10]

---

[10] *See* S.C. Code Ann. § 7-5-150 (former service members in the Armed Forces of the United States are "entitled to register for the purpose of voting in the next ensuing election after the discharge or separation from service, up to 5:00 p.m. on the day of the election" and "must be issued a registration notification stating the precinct in which he is entitled to vote and a certification to the managers of the precinct that he is entitled to vote and should be placed on the registration rolls of the precinct.")

*Second*, even for regular mail-in voter registrations, South Carolina accepts registration requests for several days beyond the formal Voter Registration Cutoffs. "If the postmark date" on a mailed in registration form "is missing or illegible, the county board of voter registration and elections must accept the application if it is received by mail" by October 9, one week after the end of in-person registration in certain counties. S.C. Code Ann. § 7-5-155(a)(1).

*Third*, South Carolina already allows in-person absentee voting to begin on October 5, the *very same day* as the mail-in cutoff. H5305/R149 of 2020, § 5 ("Beginning on October 5, 2020, each county board of elections and voter registration must provide for in-office absentee voting for the November 3, 2020, General Election."). That means that, under South Carolina's laws, South Carolinians can register to vote on October 4 and be eligible to cast their ballot by voting absentee the very next day on October 5. Extending the Voter Registration Cutoffs even all the way up to November 2 would still allow one day before the general election.

*Fourth*, South Carolina is one of only nine states with a 30-day registration deadline; it appears every other state and territory has a shorter deadline.[11] And, of the nine states, Montana allows same day registration in many cases, Mont. Code Ann. § 13-2-304(1)(a), and Louisiana allows online registrations up till twenty days before the election, La. Stat. Ann. § 18:135(A)(3). South Carolina is an outlier in the extent of the burden it places on voters, and would not suffer any prejudice from an extension of these deadlines.

For all these reasons, any inconvenience experienced by Defendants as a result of an extension of the Voter Registration Cutoffs will be minimal at best, far less than the "severe inconvenience" the court deemed insufficient in *Cegavske*, 2020 WL 2798018, at *15, and

---

[11] National Conference of State Legislatures, Voter Registration Deadlines, *available at* https://www.ncsl.org/research/elections-and-campaigns/voter-registration-deadlines.aspx#table%201

certainly insufficient to justify the severe burden on Plaintiff's First and Fourteenth Amendment rights.

### F.    Plaintiff Has Standing to Seek an Injunction

Plaintiff has organizational standing to challenge the Voter Registration Cutoffs. "To have standing, a plaintiff must be able to show: '(1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Lane v. Holder*, 703 F.3d 668, 671 (4th Cir. 2012) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180–81 (2000)). "An organizational plaintiff may establish standing to bring suit on its own behalf when it seeks redress for an injury suffered by the organization itself." *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir. 2005). "An organization may suffer an injury in fact when a defendant's actions impede its efforts to carry out its mission," *Lane*, 703 F.3d at 674–75, including limiting opportunities to advance their goals, *White Tail Park, Inc.*, 413 F.3d at 461. Although the nature of the inquiry requires examination of the claim of relief, the standing inquiry is not a merits inquiry. *Id.* at 460.

Plaintiff's "mission is to promote — through education and action — human, civil, and workers' rights, reproductive freedom, environmental protection, and government reform," Bursey Decl. ¶ 2, and "integral" to this mission "ensuring the substantive engagement of all citizens in the civic affairs of state and local governments, including by educating people about voting and registering people to vote," *id.* ¶ 3. Enforcement of the Voter Registration Cutoffs under COVID-19 circumstances will prevent Plaintiffs from registering numerous of additional voters in time for this election. *Id.* ¶ 65. Further, as a result of the pandemic and the state's responses to it, Plaintiff had to reorient its entire approach, dating back years, re-train

volunteers, purchase supplies, acquire new software, curtail its non-voter registration activities—like outreach on "health care issues affecting South Carolinians such as Medicaid expansion; worker rights (particularly in light of Covid-19); and racial and criminal justice issues," *id.* ¶ 13—and now pour resources into trying to meet an arbitrary state-imposed registration deadline. *See supra* Section I.A.  Plaintiff has thus clearly suffered a discrete injury-in-fact sufficient to confer Article III standing.  *See Fair Maps Nev. v. Cegavske*, No. 20 Civ. 271, 2020 WL 2798018, at *14–16 (D. Nev. May 29, 2020) (holding that organizational plaintiff had standing to challenge statutory election deadline because the organization was "collecting [ballot initiative] signatures until COVID-19 and the Stay at Home Order made it impossible to collect signatures in person."); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014) ("[O]rganizations can establish standing to challenge election laws by showing that they will have to divert personnel and time to educating potential voters on compliance with the laws and assisting voters who might be left off the registration rolls on Election Day."); *Kravitz v. United States Dep't of Com.*, 366 F. Supp. 3d 681, 742 (D. Md. 2019) (standing for organizational plaintiffs who had "already begun or will imminently be forced to divert resources to help mitigate the impact of the citizenship question by encouraging the communities that they serve to participate and making sure they understand that being included in the final Census count is critical"); *Nat'l Fed'n of the Blind v. United States Dep't of Educ.*, 407 F. Supp. 3d 524, 532 (D. Md. 2019) (organizational standing for an organization where the government's actions would, *inter alia*, "require it to expend resources to retrain its state and local units" to engage with constituents).

## II.    PLAINTIFF FACES IRREPARABLE HARM

Plaintiff faces irreparable harm.  The threatened "loss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury." *Giovani*

*Carandola, Ltd.*, 303 F.3d at 520–21 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm"); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." ) (internal quotation marks and citations omitted). Further, claims of infringement of a citizen's constitutional right to vote cannot be redressed by money damages, and therefore traditional legal remedies would be inadequate in this case. *See League of Women Voters of N.C.*, 769 F.3d at 247 ("[O]nce the election occurs, there can be no do-over and no redress."). As the court noted in *Scott*, "[t]his isn't golf: there are no mulligans. Once the voter registration deadline passes, 'there can be no do-over and no redress.'" *Scott*, 215 F. Supp. 3d at 1258 (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014).

Here, where the Voter Registration Cutoffs squarely threatens the First and Fourteenth Amendment rights of voter registration organizers, it is clear "that irreparable harm is *likely*, not just possible." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). In short, because Plaintiff is likely to succeed on the merits that the Voter Registration Cutoffs violate its First and Fourteenth Amendment rights, the Court should "also necessarily find[] irreparable harm." *Cegavske*, 2020 WL 2798018, at *17. Plaintiff will suffer irreparable injury if this Court does not issue a temporary restraining order and preliminary injunction to extend the registration deadline.

## III.  THE NARROW ORDER SOUGHT BY PLAINTIFF IS IN THE PUBLIC INTEREST AND WILL NOT HARM THE STATE

The remaining elements—the balancing of equities and the public interest—also favor Plaintiff. Unquestionably, the public interest "favors permitting as many qualified voters

29

to vote as possible." *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012). In the Fourth

Circuit, especially where governmental actors are involved, courts may "consider the balance of

the equities and the public interest factors together," *Int'l Refugee Assistance Project v. Trump*,

857 F.3d 554, 602 (4th Cir. 2017), and the court has found these factors established when there is

a likely First Amendment violation, *Giovani Carandola Ltd.*, 303 F.3d at 521 ("upholding

constitutional rights surely serves the public interest"). This is especially the case as the

government is "in no way harmed by issuance of a preliminary injunction which prevents the

state from enforcing restrictions likely to be found unconstitutional. If anything, the system is

improved by such an injunction." *Id.* (quotation marks and citation omitted); *accord Newsom v.

Albemarle Cnty. School Bd.*, 354 F.3d 249, 261 (4th Cir. 2003). "[C]ourts of equity may go to

greater lengths to give 'relief in furtherance of the public interest than they are accustomed to go

when only private interests are involved.'" *E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 826

(4th Cir. 2004) (quoting *Virginian Ry. Co. v. Sys. Fed'n* No. 40, 300 U.S. 515, 552 (1937)).

   Here, "[t]hese two factors also weigh in favor of issuing a preliminary injunction

[and TRO] that only declares [S.C. Code Ann. § 7-5-150] unconstitutional as applied to

Plaintiff[] by [Defendants] under the unique factual circumstances of this case," *Cegavske*, 2020

WL 2798018, at *18, for the following reasons. *First*, as explained above in the likelihood of

success on the merits analysis, the violation of Plaintiff's constitutional rights outweighs any

administrative inconvenience Defendants may suffer. *Second*, Plaintiff was effectively barred

from its usual mission of registering voters for seven months due to the state's emergency orders,

social distancing mandates, and related pandemic restrictions, "so it is both unreasonable and

unfair not to extend a statutory deadline for a corresponding period of time." *Id.*, at *15. *Third*,

an injunction is in the public interest, as "it is always in the public interest to prevent the

violation of a party's constitutional rights." *Melendres*, 695 F.3d 990, 1002 (9th Cir. 2012)

(quotation marks and citation omitted). *Fourth*, the public's interest in "permitting as many

qualified voters to vote as possible," *Obama for Am.*, 697 F.3d at 437, is plainly served by

extending the voter registration deadline—an act that will result in more South Carolinians

voting in this and future elections. This is particularly true in the context of the "worst pandemic

this state, country, and planet has seen in over a century." *League of Women Voters of Va.*, 2020

WL 2158249, at *10; *Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913, 924–25 (6th Cir. 2020)

("Were there no public health crisis, then, the analysis would be relatively straightforward . . .

But, of course, we are not living in normal times; we are living in pandemic times.").[12]

       "The principal function of a preliminary injunction is to maintain the status quo . .

. [b]ut a preliminary injunction can also act to restore, rather than merely preserve, the status quo,

even when the nonmoving party has disturbed it." *Di Biase v. SPX Corp.*, 872 F.3d 224, 231

(4th Cir. 2017) (citation omitted). That is the precisely the case here, where Plaintiff seeks to

enjoin Defendants to continue to process registrations for eligibility for the November 3 election

and not have Defendants impose an arbitrary deadline to stop processing registrations for

eligibility for the upcoming election. Moreover, Plaintiff is not asking for any change to

registration procedures that voters experience; before the Cutoffs, as after, voters can register to

vote in-person, online, or by mail. The only difference is that if a voter misses the Cutoffs their

registration does not entitle the newly-registered voter to vote until the subsequent election. All

Plaintiff asks here is that the Defendants timely process that registration—which it can do in

---

[12] Rule 65 requires that a "court may issue a preliminary injunction . . . only if the movant gives security," but "the district court retains the discretion to set the bond amount as it sees fit or waive the security requirement." *Pashby v. Delia*, 709 F.3d 307, 331–32 (4th Cir. 2013). In light of the importance of the right to be vindicated and the fact that Plaintiff is a not-for-profit public interest entity, Plaintiff respectfully requests that the Court waive the security requirement in this matter.

short order, as Defendants have admitted, and is consistent with state law including for military registrants, *see supra* Section I. E—and not impose an arbitrary and unconstitutional deadline. Because Plaintiff is not seeking any change of the laws with regards to how voters exercise their franchise, there is no reason to believe the relief sought would in any way lead to voter confusion. *Cf. Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) ("Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls.").

As Judge King on the Fourth Circuit stated earlier this week, it would be an "abdication of the courts' authority and obligation to protect the precious and fundamental right to vote" to not intervene in exceptional circumstances. *Middleton v. Andino*, No. 20-2022, Dkt. No. 43, at 7 n.* (4th Cir. Sept. 30, 2020) (King, J., concurring) (citing Judge Russell's statements in *United States v. Anderson*, 481 F.2d 685, 699 (4th Cir. 1973) that "[n]o right is more precious than the right of suffrage").

## CONCLUSION

Plaintiff is likely to succeed on its claims that, in the midst of the COVID-19 pandemic, enforcement of the Voter Registration Cutoffs will violate Plaintiff's First and Fourteenth Amendment rights. Plaintiff respectfully requests that the Court enter a temporary restraining order and preliminary injunction extending the deadline to a date no earlier than October 19, 2020.

Dated: Columbia, SC
      October 2, 2020

**BURNETTE SHUTT MCDANIEL**

By:     s/Jack E. Cohoon    

Jack E. Cohoon (Fed. ID No. 9995)
912 Lady Street, 2nd Floor
P.O. Box 1929
Columbia, South Carolina 29202
P:  (803) 850-0912
F:  (803) 904-7910
jcohoon@burnetteshutt.law

**EMERY CELLI**
**BRINCKERHOFF ABADY**
**WARD & MAAZEL LLP**

Matthew D. Brinckerhoff*
Jonathan S. Abady*
Debra L. Greenberger*
Ananda V. Burra*
600 Fifth Avenue, 10th Floor
New York, New York 10020
P:  (212) 763-5000
F:  (212) 763-5001
mbrinckerhoff@ecbawm.com
jabady@ecbawm.com
dgreenberger@ecbawm.com
aburra@ecbawm.com

**FREE SPEECH FOR PEOPLE**

John Bonifaz*
Gillian Cassell-Stiga*
Ben Clements*
Ronald Fein*
1320 Centre Street, Suite 405
Newton, Massachusetts 02459
(617) 249-3015
jbonifaz@freespeechforpeople.org
gillian@freespeechforpeople.org
bclements@freespeechforpeople.org
rfein@freespeechforpeople.org

*Attorneys for Plaintiff*

*Motions for admission pro hac vice forthcoming*